[727 NYS2d 414]

In the Matter of JOHN V. WHITBECK (Admitted as JOHN VAN HUSAN WHITBECK), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, June 21, 2001

### APPEARANCES OF COUNSEL

*Sarah Jo Hamilton* of counsel (*Thomas J. Cahill,* attorney), for petitioner.

*John V. Whitbeck,* respondent *pro se.*

### OPINION OF THE COURT

Per Curiam.

Respondent John V. Whitbeck was admitted to the practice

of law in the State of New York as John Van Husan Whitbeck by the First Judicial Department on February 11, 1974. Respondent maintained an office for the practice of law in Paris, France, between 1980 and July 1996, and currently resides and maintains an office in Jeddah, Saudi Arabia.

A notice and statement of charges were served on respondent on March 27, 2000, which alleged that respondent had conspired with his employer, through a series of intricate financial dealings, to defraud creditors of large sums of money by illegal transfers of securities in violation of Code of Professional Responsibility DR 7-102 (a) (1) and (7) and DR 7-106 (a) (22 NYCRR 1200.33, 1200.37). A hearing was held before a Referee on May 25, 2000, at which an extensive stipulation of facts signed by the Departmental Disciplinary Committee (the Committee) and respondent was entered into evidence. Respondent did not appear, but requested his submissions in mitigation be considered.

The Referee, in a report dated October 19, 2000, sustained all three of the charges brought against respondent and found that in 1980, respondent was employed as general counsel to a group of companies owned and controlled by Saudi businessman Ghaith Rashad Pharaon (the Pharaon Group). Pharaon became the subject of adverse publicity in 1990 and was also under investigation by various United States authorities for participation in illegal banking activities involving the Bank of Credit & Commerce International (BCCI).

Charge One against respondent revolves around the activities of Pharaoh Holdings, Ltd., one of the Pharaon Group, which was encumbered with a £19.5 million liability to a London real estate developer. Respondent maintained that he was in fear of losing his job and believed finding alternative employment would be difficult in light of Pharaon's tarnished reputation, so he participated in a scheme to strip Pharaoh Holdings of its assets so as to render it judgment-proof. Respondent, in order to cover up the scheme, arranged an elaborate series of transfers, for no consideration, which resulted in the ultimate beneficial ownership of Pharaoh Holdings' underlying assets remaining unchanged.

Specifically, respondent stipulated that his conduct violated DR 7-102 (a) (1) "insofar as he transferred Pharaoh's assets to PHL [PHL Holdings Ltd. was Pharaoh's parent company] at the direction of Mr. Pharaon when he knew or when it was obvious that the transfers were merely intended to harass or maliciously damage City Gate since City Gate was, for all

intents and purposes, certain soon to be a judgment-creditor of Pharaoh; since he understood that Pharaoh had no viable defense to payment of the debt incurred under the Guarantee; and since Pharaoh possessed more than sufficient assets to satisfy its debts to City Gate before the transfers were accomplished."

Charge Two arises from respondent's involvement with the 1991 collapse of BCCI and its subsidiary bank, Cayman Island International Credit and Investment Company, Ltd. (ICIC).[1] On or about November 9, 1992, the Supreme Court of the Bahamas issued an order to Concorde International Trading, S. A., one of Pharaon's Panamanian companies of which respondent was an officer and director, to refrain from interfering with a court-appointed receiver. Respondent, despite having notice of the Bahamas court order, refused to cooperate with the receiver and by subsequent stipulation, agreed his conduct constituted a violation of DR 7-106 (a), the failure to comply with a ruling of a tribunal, "insofar as he took actions, or refrained from taking actions, as part of a calculated effort by the Pharaon Group to obstruct the court-appointed Bahamas receiver."

Charge Three concerns a series of Cayman Island court orders barring the transfer outside of its jurisdiction of the assets of various Pharaon-controlled entities. Respondent, however, participated in the transfer of such assets to Panamanian companies acquired on behalf of the Pharaon Group, although he denied knowing that the transfers were in violation of Cayman Island court orders. As a result, respondent contended that his conduct was not fraudulent, in violation of DR 7-102 (a) (7), but, rather, was properly characterized as harassment of an adversary in violation of DR 7-102 (a) (1). The Referee thereafter approved the Committee's request to amend Charge Three to allege a violation of DR 7-102 (a) (1).

In mitigation, the Referee considered that respondent agreed to cooperate with the liquidators and receivers in England, the Cayman Islands and the Bahamas in exchange for them not seeking a judgment against him, and provided details of Phara-

---

**1.** In an attempt to counter large financial losses, BCCI sought to generate fast profits by secretly investing money in potentially high-growth corporations through nominees, such as Mr. Pharaon, who would take the loans and purchase shares in targeted corporations so it would appear that he was the true owner of the shares. At the time BCCI and ICIC were closed, Mr. Pharaon had $523 million in loans from BCCI (or a related entity) recorded in his name.

on's illicit schemes and rendered other assistance to, *inter alia,* the Federal Reserve and the United States liquidators of BCCI. The Referee noted that: respondent did not personally benefit from his actions; that he had no disciplinary history; that he had been candid and cooperated in the disciplinary proceeding; and that he had submitted numerous letters attesting to his good character.

The Referee further noted that respondent admitted before the Cayman Islands court that he was in civil contempt of that court's order forbidding the removal of assets from the jurisdiction. The court further opined that:

> *"I do regard Mr. Whitbeck's disobedience of the court's order not to be deliberate* * * * while I accept that he did take the opinion of overseas lawyers as to the course that he should adopt * * * as an attorney he should have known that he had access to this court for an interpretation of the order and he had access to local attorneys. Mr. Whitbeck has tendered an immediate apology to the court and he has attempted to rectify the situation as best he can by endeavoring to return these shares to their jurisdiction and it is not his fault that he has been unable to do so" (emphasis added).

In conclusion, the Referee agreed with the Committee staff's recommendation of a three-year suspension, but found that since respondent was in Saudi Arabia, the more appropriate sanction would be a two-year suspension imposed immediately and a second two-year suspension to begin if respondent returns to the United States.[2]

A Hearing Panel convened, heard oral argument, and, after deliberation, issued a report dated January 16, 2001 in which two Panel members voted to affirm the Referee's recommended sanction, and two members voted to recommend disbarment.

The Committee, by petition dated March 23, 2001, now seeks an order, pursuant to 22 NYCRR 603.4 (d) and (e) (2), confirming the findings of fact of the Referee and Hearing Panel, suspending respondent for three or four years, or granting any relief this Court deems appropriate. The Committee, with

---

2. The Committee notes that while the Referee's recommendation of a split suspension is inventive, it creates logistical issues insofar as it appears respondent would have to be readmitted after the first two-year suspension in order to be suspended again upon his return to the United States.

regard to mitigation, additionally notes that the Federal Reserve had commented that respondent was placed in a "rather untenable position" of taking instructions from his employer and receiving erroneous legal advice. Moreover, the United States Attorney for the court appointed fiduciaries of BCCI attested to the value of the information provided by respondent in their recovery efforts and opined that respondent, with whom he has had extensive contact, was "genuinely regretful with respect to his previous activities, the consequences of which he did not fully contemplate at the time."

Initially, we take note of the fact that with regard to Charge Three, the Referee found that respondent had violated DR 7-102 (a) (1) (that he knew his actions would harass or maliciously injure another), and not DR 7-102 (a) (7) (that he knew his conduct to be illegal or fraudulent). We also note that there is considerable evidence in mitigation including: respondent's cooperation with the investigations into Pharaon's illicit schemes and the fact that his assistance to both American and British authorities was invaluable to their asset recovery efforts; his candor, as noted by the Referee; and his clean disciplinary record and voluminous character evidence. In view of the foregoing, we conclude that a suspension from the practice of law for a period of four years is an appropriate sanction (see, Matter of Yamada, 197 AD2d 235, lv denied 83 NY2d 761).

Accordingly, the Committee's petition should be granted to the extent that the Panel's findings of fact and conclusions of law are confirmed, and respondent suspended from the practice of law for a period of four years.

SULLIVAN, P. J., NARDELLI, WILLIAMS, RUBIN and MARLOW, JJ., concur.

Respondent suspended from the practice of law in the State of New York for a period of four years, effective July 23, 2001, and until the further order of this Court.